# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**PETER J. RUSTHOVEN**
Barnes & Thornburg LLP
Indianapolis, Indiana

**BRIAN N. CUSTY**
Merrillville, Indiana

ATTORNEYS FOR APPELLEES:

**F. JOSEPH JASKOWIAK**
**LAUREN K. KROEGER**
Hoeppner Wagner & Evans LLP
Merrillville, Indiana

**FILED**

May 07 2013, 8:31 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

THINK TANK SOFTWARE DEVELOPMENT )
CORPORATION d/b/a THINK TANK )
NETWORKING TECHNOLOGIES GROUP )
and THINK TANK INFORMATION SYSTEMS, )
)
    Appellant-Plaintiff, )
)
        vs. )    No. 64A05-1205-PL-270
)
CHESTER, INC., MIKE HEINHOLD, )
JOHN MARIO, JOEL PARKER, )
THOMAS GUELINAS, JON MEYER, )
DANIEL CURRY, ERIC M. WOJCIECHOWSKI, )
MICHAEL GEE, PHILIP RYAN TURNER and )
CARL ZUHL, )
)
    Appellees-Defendants. )

APPEAL FROM THE PORTER SUPERIOR COURT
The Honorable David L. Chidester, Judge
Cause No. 64D05-0205-PL-3861

**May 7, 2013**

**OPINION - FOR PUBLICATION**

**SHARPNACK, Senior Judge**

STATEMENT OF THE CASE

In this interlocutory appeal, Think Tank Software Development Corporation d/b/a Think Tank Networking Technologies Group and Think Tank Information Systems ("Think Tank") seeks review of the trial court's grant of a motion to exclude testimony from its expert witness on economics and business valuation. The motion was filed by Chester, Inc., Mike Heinold, John Mario, Joel Parker, Thomas Guelinas, Jon Meyer, Daniel Curry, Eric M. Wojciechowski, Michael Gee, Philip Ryan Turner, and Carl Zuhl (collectively, "Chester"). We reverse and remand.

ISSUES

Think Tank raises two issues, which we restate as:

I.      Whether the trial court abused its discretion by granting Chester's motion to exclude Think Tank's expert witness testimony.

II.     Whether this Court's prior decision in this case requires clarification on the subject of damages.[1]

FACTS AND PROCEDURAL HISTORY

The relevant facts, as stated in the prior decision in this case, are as follows:

Think Tank is engaged in computer-related business activities, including systems and network engineering, problem solving, systems design, implementation, sales, client training, and computer maintenance. As of April 19, 2001, Think Tank employed defendants Mario, Parker, Guelinas, Meyer, Curry, Wojciechowski, Gee, Turner, and Zuhl (collectively, the former employees).

Think Tank required most, if not all, employees to sign employment agreements containing a covenant not to compete.

---

[1] Chester has filed a Motion to Strike. We deny the motion by separate order.

2

. . . .

During a period ranging from April 20, 2001, to April 19, 2002, all of the former employees left Think Tank for various reasons, shrinking Think Tank's staff from sixteen to nine employees. With the exception of Parker, all of the former employees went directly from Think Tank to Chester. [Parker worked for another employer for five months before going to work for Chester.] Chester was informed of the covenant not to compete by Curry, Gee, Guelinas, Wojciechowski, and Zuhl. However, Mario, Parker, Meyer, and Turner did not believe they had signed the covenant when they were hired by Think Tank, and Think Tank could not produce the signed agreements. Think Tank's president asserts that each of these four signed the covenant in his presence.

On April 26, 2002, Think Tank filed its "Verified Complaint For Injunctive And Other Relief" against Chester; Chester's manager, Heinhold; and the former employees. Among other things, Think Tank alleged in its complaint that its former employees were violating the covenant not to compete by contacting Think Tank personnel and customers. Think Tank further alleged that Chester, Heinhold, and the former employees were interfering with Think Tank's business by divulging confidential information and trade secrets. Three days later, after an ex parte emergency hearing, a Lake Superior Court granted a temporary restraining order finding that Think Tank had "a protectable interest in its goodwill (which includes all its customer information and relationships as well as its employees) and reputation . . . ." The court further found that "the provisions of [the covenant] provide reasonable and appropriate restrictions on post-employment conduct of [Think Tank's] employees; and that all defendants in concert with one another have either breached the [covenant] or induced or aided the breach . . . ."

On May 1, 2002, the defendants filed for a change of venue, and the Lake Superior Court transferred the case to the Porter Superior Court on May 6, 2002. After a hearing on the defendants' motion to dissolve the temporary restraining order, the trial court ruled on May 10, 2002, that the temporary restraining order was not properly issued because Think Tank failed to give proper notice pursuant to Indiana Rule of Trial Procedure 65(B)(2) and failed to post bond pursuant to Indiana Rule of Trial Procedure 65(C).

On June 7, 2002, Think Tank filed its "First Amended Verified Complaint For Injunctive And Other Relief." In this amended complaint,

Think Tank asserted breach of contract and tort claims against various defendants.

Think Tank did not pursue injunctive relief, and on August 24, 2004, the defendants moved to dismiss the case due to Think Tank's lack of prosecution. The motion was denied and discovery continued until November 30, 2009. On December 31, 2009, the defendants filed a motion for summary judgment challenging Think Tank's claims. On March 9, 2010, after holding a hearing and reviewing the designated evidence of all parties, the trial court granted the motion for summary judgment for the defendants on all of the claims raised by Think Tank in its first amended complaint. In doing so, the trial court concluded that the covenant not to compete in the various employment agreements "is overbroad and is therefore unenforceable . . . and cannot be reformed." The court also concluded that "the information alleged to have been misappropriated by [the defendants] does not constitute a 'trade secret' under the Indiana Trade Secret Act and therefore [Think Tank's] claim for misappropriation fails as a matter of law." The court further concluded as a matter of law that Think Tank's claims for interference with a business relationship, unfair competition, and unjust enrichment "do not apply to the fact situation of this case."

*Think Tank Software Dev. Corp. v. Chester, Inc.* (*Think Tank I*), No. 64A03-1003-PL-172

*1-3 (Ind. Ct. App. Apr. 11, 2011) (footnotes and record citations omitted).

In concluding our opinion, we stated,

The trial court erred in granting summary judgment on the basis that the covenant not to compete was overbroad. The trial court also erred in granting summary judgment on the propriety of the confidentiality clause, as there are genuine issues of material fact that must be determined. Further, the trial court erred in granting summary judgment on the tortious interference with a contract issue. The trial court did not err in granting summary judgment on any of the remaining issues.

We affirm in part, reverse in part and remand for further proceedings consistent with this opinion. In doing so, we instruct the trial court to be mindful of the restrictions expressed in our discussion of Issues I, III and IV.

*Id.* at *16.

4

Implicit in *Think Tank I*, but not stated in its conclusion, is that the claim for misappropriation of trade secrets was included with the claims for breach of the covenant not to complete, for breach of the confidentiality clause, and for tortious interference with a contract that remained for trial after our review of the summary judgment rendered by the trial court. As we stated in footnote four to the opening of Issue II. Breach of Contract: Confidentiality Clause:

> The defendants equate the confidentiality clause issue with the misappropriation of trade secrets issue as raised in the court below and as framed by the parties in their appellate briefs. We agree that the misappropriation of trade secrets issue is subsumed by the confidentiality clause issue. We will examine the validity of the confidentiality clause under the summary judgment standard of review, and our decision on this issue stands as a decision on the claim for misappropriation of trade secrets.

*Id.* at *7. We concluded, as to the confidentiality clause,

> [T]here is a genuine issue of material fact that prevents the grant of summary judgment on this issue. The fact finder must determine whether the items contained in the confidentiality clause are trade secrets that may be protected. If they are not, then Think Tank has not asserted that the covenant to not compete asserts a legitimate interest that may be protected and/or that the former employees have gained a unique competitive advantage or ability to harm Think Tank.

*Id.* at *9. We also necessarily found that the same issue existed as to the claim for misappropriation of trade secrets.

In the course of our opinion, we noted that Think Tank had submitted a report by its economics expert, Benjamin S. Wilner. We stated as follows with respect to Wilner's report:

5

In an apparent attempt to create a genuine issue of material fact pertaining to customers in addition to the nine referred to above,[2] Think Tank points to a report prepared by a third party that lists the customers it lost in the years following the former employees' transfer to Chester, and it proposes that some of these losses could be attributable to breach of covenants. The supposed losses that "could be attributable to breach" compose the entire result of seven years of discovery. In an industry where even Think Tank's third party expert documents that Think Tank normally retains customers for an average of only 2.3 years, we cannot view the report as anything but speculative. In short, the report says little more than that even though Think Tank lost almost all of its key employees and it normally loses a percentage of its customers each year, Think Tank guesses that some of the lost customers must be attributable to the defendants' actions. Mere speculation cannot create genuine issues of material fact to defeat summary judgment. *See Beatty v. LaFountaine*, 896 N.E.2d 16, 20 (Ind. Ct. App. 2008) (holding that mere speculation, guesses, supposition, and conjecture "are not sufficient to create a genuine issue of material fact to defeat summary judgment"), *trans. denied.*

*Id.* at \*12.

While the appeal was pending, Wilner had produced a second report, entitled a "Supplementary Expert Report," examining sales information that Chester had provided. Appellant's Supp. App. p. 301. After we issued *Think Tank I*, Wilner issued a third report, entitled a "Rebuttal Expert Report." Appellant's App. p. 158. Next, Chester moved the court to exclude Wilner's testimony from trial. Think Tank filed a response, and Chester filed a reply. The trial court initially scheduled a hearing on Chester's motion. However, the court ultimately granted the motion without a hearing, quoting the above paragraph from this Court's opinion in *Think Tank I* and concluding that Wilner's testimony would be inadmissible at trial. Next, the court granted Think Tank permission

---

[2] In the first appeal, Think Tank identified nine customers as to which it claimed there was a genuine issue of material fact regarding loss of net profits. We concluded that such an issue existed only as to four of them: Braun Corporation, Lowell Public Library, Weil-McClain, and Methodist Hospital.

to pursue a discretionary interlocutory appeal. The parties jointly asked this Court to accept this appeal, and the motions panel granted the parties' request.

DISCUSSION AND DECISION

I. EXCLUSION OF EXPERT ECONOMICS TESTIMONY

Think Tank argues that nothing in this Court's decision in *Think Tank I* rendered Wilner's testimony inadmissible, so the trial court should not have excluded it. Chester responds that the trial court properly excluded Wilner's testimony because it did not, in Chester's opinion, comply with the requirements for expert opinion evidence under Indiana Evidence Rule 702.

A trial court's determination regarding the admissibility of expert testimony is a matter within its broad discretion and will be reversed only for abuse of that discretion. *Bennett v. Richmond*, 960 N.E.2d 782, 786 (Ind. 2012). An abuse of discretion occurs if the court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the trial court has misinterpreted the law. *Bridgestone Ams. Holding, Inc. v. Mayberry*, 878 N.E.2d 189, 191 (Ind. 2007).

We start with Think Tank's argument regarding the doctrine of law of the case. Pursuant to that doctrine, an appellate court's determination of a legal issue is binding on the trial court and this court in any subsequent appeal in the same case and involving the same facts. *Dean V. Kruse Found. v. Gates*, 973 N.E.2d 583, 590 (Ind. Ct. App. 2012), *trans. denied*. The purpose of the doctrine is to minimize unnecessary relitigation of legal issues once they have been resolved by an appellate court. *Id.* To invoke this doctrine, the matters decided in the earlier appeal must clearly appear to be the only

7

possible construction of an opinion. *Id.* Questions not conclusively decided in the earlier appeal do not become law of the case. *In re Guardianship of Stalker*, 953 N.E.2d 1094, 1102 (Ind. Ct. App. 2011). Furthermore, unlike the related doctrine of res judicata, the doctrine of law of the case is not a uniform rule of law but rather a discretionary rule of practice. *State v. Lewis*, 543 N.E.2d 1116, 1118 (Ind. 1989).

Here, we stated as follows in *Think Tank I* with respect to Wilner's report:

> *In an apparent attempt to create a genuine issue of material fact pertaining to customers in addition to the nine referred to above*, Think Tank points to a report prepared by a third party that lists the customers it lost in the years following the former employees' transfer to Chester, and it proposes that some of these losses could be attributable to breach of covenants. The supposed losses that "could be attributable to breach" compose the entire result of seven years of discovery. In an industry where even Think Tank's third party expert documents that Think Tank normally retains customers for an average of only 2.3 years, we cannot view the report as anything but speculative. *In short, the report says little more than that* even though Think Tank lost almost all of its key employees and it normally loses a percentage of its customers each year, *Think Tank guesses that some of the lost customers must be attributable to the defendants' actions. Mere speculation cannot create genuine issues of material fact to defeat summary judgment. See Beatty v. LaFountaine*, 896 N.E.2d 16, 20 (Ind. Ct. App. 2008) (holding that mere speculation, guesses, supposition, and conjecture "are not sufficient to create a genuine issue of material fact to defeat summary judgment"), *trans. denied.*

*Think Tank I*, No. 64A03-1003-PL-172, at *12 (emphasis added).

Thus, the context of our discussion of Wilner's report in *Think Tank I* was whether it established causation for the loss of some of Think Tank's customers, and we concluded that the report did not give rise to a dispute of material fact on that point.

After remand, Wilner prepared a third report, the Rebuttal Expert Report. Rather than address the loss of some of Think Tank's customers as he did in his first and second

reports, Wilner's third report focused upon damages that he concluded Think Tank sustained due to the loss of four specific customers identified in *Think Tank I*, in addition to general profit erosion caused by the defection of Think Tank's former employees to Chester. Thus, Wilner's third report, and his proposed testimony at trial, addresses questions not conclusively decided in the earlier appeal. As a result, we conclude that the doctrine of law of the case does not bar the admission of Wilner's testimony at trial. *See Gates*, 973 N.E.2d at 591 (determining that law of the case did not bar the court's consideration of whether forfeited earnest money constitutes liquidated damages or a penalty because that issue was not expressly decided in the prior appeal).

Next, we turn to whether Wilner's expert testimony is admissible under Indiana Evidence Rule 702. As a preliminary matter, Chester argues that Think Tank is barred from addressing Rule 702 in this appeal because Think Tank did not discuss that rule in its initial appellate brief. We disagree. Chester presented argument under Rule 702 in its Appellees' Brief, and Think Tank properly responded to Chester's argument in its Reply Brief. *See* Ind. Appellate Rule 46(C) ("The appellant may file a reply brief responding to the appellee's argument."). Furthermore, the parties extensively briefed the applicability of Evidence Rule 702 during trial court proceedings, so we are considering an issue that was presented to the trial court.[3]

Rule 702 provides:

---

[3] The appealed order is ambiguous as to whether the trial court based it on the quoted portion of *Think Tank I* or on 702 principles, although it did recite: "The Court, having reviewed the Motions and Memorandum [sic] of the parties, now *grants* the motion to exclude the evidence of Doctor Wilner." Appellant's App. p. 103.

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

In this case, both Wilner's qualifications as an expert and the reliability of the scientific principles upon which his testimony rests are in dispute.

## A. WILNER'S QUALIFICATIONS

Chester argues that Wilner is not qualified to render an opinion on causation. The trial court is considered the gatekeeper for the admissibility of expert opinion evidence under Rule 702(a) and (b). *Person v. Shipley*, 962 N.E.2d 1192, 1194 (Ind. 2012). Indiana Evidence Rule 702(a) requires that an expert be qualified as such by evidence of knowledge, skill, experience, training, or education. *State Auto Ins. Co. v. DMY Realty Co.*, 977 N.E.2d 411, 423 (Ind. Ct. App. 2012). Therefore, before an expert may testify about a subject, the proponent of the expert must show that the expert is competent in that subject. *Id.* In addition, the proponent of expert testimony must show that the subject matter is distinctly related to some scientific field, business, or profession beyond the knowledge of the average layperson. *Jackson v. Trancik*, 953 N.E.2d 1087, 1092 (Ind. Ct. App. 2011).

Here, Wilner's curriculum vitae indicates that he has a Ph.D. in "Managerial Economics and Decision Science." Appellant's App. p. 168. In addition, he has over fifteen years of professional experience, including work as a professor of finance, as an

economist, and as a professional expert in business valuation, statistics, and financial damages, among other areas. Wilner has also published articles on economic and business matters and has given presentations to federal agencies, universities, and professional organizations on business valuation and other economic issues. His knowledge of economics and business valuation is beyond the knowledge of the average layperson. Therefore, Wilner's extensive education, training, and experience qualify him as an expert witness with respect to economics and business valuation matters. *See Jackson*, 953 N.E.2d at 1092 (determining that a witness was qualified as an expert in medical billing matters based on her experience, training, and education in her field).

## B. RELIABILITY OF SCIENTIFIC PRINCIPLES

The parties disagree as to whether Wilner's expert opinions are based on reliable scientific principles pursuant to Evidence Rule 702(b). The court must make a preliminary assessment of whether the reasoning or methodology underlying an expert's testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue. *Person*, 962 N.E.2d at 1196. As part of this process, Rule 702(b) directs the trial court to consider the underlying reliability of the general principles involved in the subject matter of the testimony, but it does not require the court to reevaluate and micromanage each subsidiary element of an expert's testimony within the subject. *Norfolk S. Ry. Co. v. Estate of Wagers*, 833 N.E.2d 93, 103 (Ind. Ct. App. 2005), *trans. denied*. The proponent of expert testimony bears the burden of establishing the reliability of the scientific principles upon which the testimony is based. *Turner v. State*, 953 N.E.2d 1039, 1049 (Ind. 2011).

11

There is no specific test for determining whether expert scientific testimony satisfies Rule 702(b). *Franciose v. Jones*, 907 N.E.2d 139, 146 (Ind. Ct. App. 2009), *trans. denied*. Federal courts have adopted the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Indiana courts are not bound by *Daubert* when analyzing evidence under Indiana Evidence Rule 702(b), but we find the principles stated in that case to be helpful. *Turner*, 953 N.E.2d at 1050. Thus, in determining whether evidence is admissible under Rule 702(b), we may consider whether the theory or technique can be and has been tested, whether the theory has been subjected to peer review and publication, whether there is a known or potential error rate, and whether the theory has been generally accepted within the relevant field of study. *Id.* at 1048 (citing *Daubert*, 509 U.S. at 593-94). The focus of the admissibility test is on the methodology of the theory or technique, not on the conclusions generated. *Miller v. Bernard*, 957 N.E.2d 685, 693 (Ind. Ct. App. 2011). Furthermore, our Supreme Court's adoption of Rule 702 reflected an intent to liberalize, rather than to constrict, the admission of reliable scientific evidence. *Turner*, 953 N.E.2d at 1050.

In this case, after this Court issued *Think Tank I*, Wilner produced the Rebuttal Expert Report referenced above. He reviewed numerous documents provided by Think Tank and Chester and spoke with Think Tank's president and counsel in the course of preparing his report. In the report, Wilner calculated Think Tank's damages in two categories: lost sales to four specific customers and general profit erosion caused by the defection of Think Tank's former employees. He explained the basis for his calculations,

12

identified the assumptions underlying his calculations, and the reasons why he compared certain data. He also took into account other potential causes for Think Tank's losses, calculating the effect of a 2002 "inventory adjustment" that was unrelated to Chester's actions. Appellant's App. p. 159. Wilner indicated that his overall methodology was based on "the benchmark method" as described in a publication from the American Institute of Certified Public Accountants captioned "Calculating Lost Profits." *Id.* at 163; Appellant's Supp. App. p. 458. Chester's economics expert agreed that the benchmark method is a generally-accepted tool for calculating damages and has used the method himself. Appellant's Supp. App. p. 426. In a deposition, Wilner also characterized his work as "an event study," which he asserted is "standard in economics and finance." Appellees' App. p. 73.

In addition, Wilner used the "yardstick approach" to calculate general profit erosion. Appellees' App. p. 84. This method of damage calculation is "well accepted." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 551 (7th Cir. 1986); *see also* Appellant's Supp. App. pp. 376, 390, 404 (presentations from accounting conferences describing the yardstick method as one of several accepted methods for calculating damages). Thus, Wilner's conclusions are based on scientifically valid, reliable theories within the field of economics. Consequently, to the extent the trial court's ruling rests on Indiana Evidence Rule 702(b), we conclude that the trial court overstepped its gatekeeper role and abused its discretion by excluding Wilner's testimony. *See Miller*, 957 N.E.2d at 694-95 (determining that the court erred by excluding an expert witness's testimony because any

failure by the expert to consider all of the relevant facts went to the weight of the expert's opinion, not its admissibility).

Many of Chester's objections to Wilner's opinions as stated in the rebuttal report are, in essence, claims that Wilner failed to express an opinion on causation. For example, Chester asserts that Wilner "fail[ed] to identify the profit erosion caused by unlawful activity" and "simply assumed that Chester's sales to these customers would equal Think Tank's lost sales." Appellees' Br. pp. 35, 39. However, Think Tank is not obligated to prove every element of its claims through expert opinion. Indeed, Wilner stated in his deposition that his rebuttal report was limited to the question of damages, and Think Tank concedes, "Wilner has not opined on causation." Appellant's Reply Br. p. 19. To the extent that the finder of fact concludes that Wilner's testimony fails to establish the causation element of Think Tank's claims, Think Tank will have to prove causation through other evidence, or its claims will fail and Wilner's expert opinion on damages will be pointless. *See Saks Fifth Ave., Inc. v. James, Ltd.*, 630 S.E.2d 304, 312 (Va. 2006) (reversing verdict for plaintiff where the plaintiff's expert provided evidence as to damages, but plaintiff failed to otherwise demonstrate proximate causation between the defendants' conduct and claimed damages).

Chester further argues that Wilner's opinion is flawed because Wilner based his understanding of the facts solely upon conversations with Think Tank's president. However, it is undisputed that Wilner reviewed numerous documents provided by Think Tank and Chester in the course of preparing his rebuttal report. Furthermore, Wilner said in his deposition that he learned the facts of the case from "the record and [Think Tank's

14

president].” Appellees’ App. p. 82. Thus, Wilner’s opinion is not based solely upon what Think Tank told him. Chester further argues that Wilner ignored information, erroneously changed his analytical model between issuing his first report and his rebuttal report, made flawed assumptions in evaluating lost sales for the four customers, and failed to independently investigate the case. These points go to the credibility and weight to be given to Wilner’s testimony at trial. Once an expert’s scientific theories are determined to be reliable under Rule 702, the crucible of cross-examination is the means of exposing dissimilarities between the actual evidence and an expert’s scientific theories. *Turner*, 953 N.E.2d at 1051.

For the reasons stated above, the trial court’s ruling that Wilner’s testimony is inadmissible at trial is reversed.

## II. CLARIFICATION OF *THINK TANK I*’S HOLDING ON DAMAGES

Think Tank contends that *Think Tank I* requires clarification as to whether all four of its surviving claims have limits as to damages. Chester responds that Think Tank should have sought clarification by filing a petition for rehearing or a petition for transfer, and the deadlines for those petitions have expired.

This case is already over a decade old, having been originally filed in Lake County in 2002. Furthermore, the case is being prepared for trial, and clarification of damages will facilitate a swifter final judgment. Finally, the parties currently dispute the extent of the ruling in *Think Tank I*, because Chester argues in this appeal that Think Tank is barred by the holding in *Think Tank I* from presenting a claim for damages resulting from profit erosion. Consequently, we will address the issue.

15

Stated simply, four of Think Tank's claims survived summary judgment: breach of a covenant not to compete, breach of a covenant of confidentiality, misappropriation of trade secrets, and tortious interference with contract. In *Think Tank I*, we noted, "The proper measure of damages for breach of a covenant is the plaintiff's lost net profits." No. 64A03-1003-PL-172, at * 9. Next, we concluded that Think Tank had established a dispute of material fact as to lost profits arising from Chester's relationship with four specific customers. Consequently, we limited the damages for Think Tank's claim for breach of the covenant not to compete to lost profits in relation to those four customers. This holding also applies to Think Tank's claim for breach of a covenant of confidentiality. Similarly, with respect to Think Tank's claim for tortious interference with contract, we determined that the claim only survived summary judgment as to the same four customers. *Id.* at *14. It stands to reason that Think Tank's damages for misappropriation of trade secrets is also limited to those four customers. However, we said nothing about any measure of damages for tortious interference with contract or for misappropriation of trade secrets. Nothing in *Think Tank I* should be understood to limit or define damages under those two claims.

Finally, to the extent that Wilner's profit erosion analysis is based solely on the departure from Think Tank of the defendant employees and their subsequent employment by Chester, the analysis may be inadmissible because the defendant employees were free to leave and become employees elsewhere. They committed no wrong, contractually or otherwise, against Think Tank merely by leaving.

## CONCLUSION

For the reasons stated above, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

Reversed and remanded.

BAILEY, J., and DARDEN, S.J., concur.