953 N.E.2d 1094 (2011)
In re the GUARDIANSHIP OF David STALKER
David Stalker, Appellant-Protected Person/Cross-Appellee,
v.
Mary C. Pierce, Appellee-Former Guardian/Cross-Appellant.
No. 61A04-1008-GU-562.
Court of Appeals of Indiana.
July 29, 2011.
*1097 Kathy L. Osborn, Sarah Jenkins, Baker & Daniels LLP, Indianapolis, IN, Attorneys for Appellant.
John D. Pierce, Pierce Pierce & Stites, Rockville, IN, Attorney for Appellee.

OPINION
RILEY, Judge.

STATEMENT OF THE CASE
Appellant-Protected Person/Cross-Appellee, David L. Stalker (Stalker), appeals the trial court's approval of Appellee-Former Guardian/Cross-Appellant's, Mary C. Pierce (Pierce), final accounting and the trial court's denial of Stalker's request for money damages.
We reverse and remand for further proceedings.

ISSUES
Stalker presents two issues on appeal, which we restate as follows:
(1) Whether Pierce breached her fiduciary duty as Stalker's guardian; and
(2) Whether Pierce violated Stalker's due process rights when she failed to notify Stalker of her unilateral decision to demolish his home and personal belongings.
On Cross-Appeal, Pierce presents one issue, which we restate as the following:
Whether the law of the case doctrine bars Stalker's instant claim.

FACTS AND PROCEDURAL HISTORY
On February 23, 2005, Stalker consented to the appointment of Pierce, a local Parke County attorney and appointed member of the Parke County Board of Health, as a permanent guardian over his person and property. Pierce knew about Stalker and *1098 the condition of his home prior to becoming his guardian. Knowing that his home had gotten out of hand, Stalker voluntarily sought out Pierce's legal advice and began working with her to organize his finances so that he would be able to have his house "remodeled." (Transcript p. 17). After Stalker consulted with Pierce and after neighbors complained about the condition of his property to the Board of Health, Pierce petitioned the trial court to appoint her as Stalker's permanent guardian. Stalker initially consented to the appointment because of the work they had done on his finances. Together with the consent of appointment of guardian and waiver of notice of hearing, Pierce filed two letters documenting Stalker's capacity: a letter by Dr. J. Franklin Swaim with the Parke County Health Department (Health Department) and a letter from Adult Protective Services. Both letters confirmed that Stalker suffers from a mental disability and is unable to care for his personal needs or manage his residence. On April 19, 2005, the trial court appointed Pierce as guardian over Stalker's person and property, "without bond being required." (Appellant's App. p. 28).
Sometime in late May or early June of 2005, Stalker submitted an application for the Community Action Program, Inc.'s (CAP) Owner Occupied Rehabilitation Program which can make improvements to homes that do not meet the Indiana Housing Finance Authority's Rehabilitation Standards. On June 10, 2005, Pierce was notified by CAP that Stalker's residence did not qualify for the program "as the extent of the repairs required under the rehab standards far exceeded the program's financial capacity." (Appellant's App. p. 144).
On November 22, 2005, when Stalker became dissatisfied with Pierce as his guardian, he petitioned the trial court to have the guardianship terminated. In his handwritten request, he asked for a "total release of the guardianship" as he felt competent to take care of himself with the aid of the Hamilton Center, a local mental health service provider. (Appellant's App. p. 30). The trial court scheduled a hearing for January 13, 2006.
On December 2, 2005, two weeks after Stalker filed his petition to terminate guardianship, Pierce filed a complaint against Stalker with the Parke County Board of Health. Four days after filing the complaint, Pierce, accompanied by a Health Department inspector, visited Stalker's home and asked for permission to enter the residence. On January 2, 2006, following the inspection of Stalker's home, the Health Department notified Stalker that his home was "found to be unfit for human habitation." (Appellant's App. p. 113). In order to avoid penalties or an order to vacate his residence, Stalker had to complete several repairs within ten days. Specifically, he was required to repair holes in the home's floor; repair the plumbing and sewage system; remove all animal and human feces in the house; and dispose of all household garbage throughout the home and yard. The Health Department never conducted any additional inspection of the property or took any other actions.
After Pierce received a copy of the Health Department's notice, she arranged for Stalker to move to an apartment in Rockville, Indiana, which was almost ten miles from his house in Bridgeton, Indiana. Initially, Stalker refused to leave his family home and hometown. He did not want to live almost ten miles from Bridgeton as his only mode of transportation was a bicycle which would make traveling back and forth almost impossible in winter and would make compliance with the Health Department's order difficult.
*1099 On January 13, 2006, the trial court commenced its hearing on Stalker's petition to terminate guardianship. During the proceedings, the trial court did not appoint a guardian ad litem or an attorney to aid Stalker. Pierce called the Health Department inspector to demonstrate the condition of the house and the need for the guardianship. As Stalker's guardian, she had also signed a release for Stalker's case manager at the Hamilton Center to testify about Stalker's mental capacity and treatment. During the hearing, Pierce questioned Stalker about the steps he had taken to comply with the Health Department's notice. At the conclusion of the hearing, the trial court determined that Stalker had a mental illness which prohibited him from properly caring for himself. The trial court noted that "[a]s long as [Pierce] wants to remain as [Stalker's] guardian, she's going to be [his] guardian" and warned Stalker to cooperate with her. (Appellant's App. p. 93). Meanwhile, the trial court advised Stalker to start cleaning up the property with Pierce's help, who could hire any contractor needed to get the home habitable again. The trial court then appointed counsel to represent Stalker during a review hearing.
During the two months between the January hearing and a scheduled review hearing in March, Stalker had difficulties complying with the trial court's order to clean up his property. First, the winter weather was not conducive to travelling ten miles by bicycle between his Rockville apartment and his Bridgeton home. Additionally, the time he could spend on cleaning efforts was further limited by his therapy sessions at the Hamilton Center and his participation in intensive case management five days a week. Also, Pierce had locked his residence and refused to give him the keys, citing safety concerns.
At the review hearing of March 17, 2006, Stalker was represented by his court-appointed counsel who petitioned the court to have an independent psychiatric evaluation conducted by Dr. John Gonzalez (Dr. Gonzalez). The trial court granted the request. During the proceeding, Stalker requested the keys to his residence and outbuildings so that he could start the interior cleanup. Pierce was unwilling to allow Stalker access to the house until he made progress cleaning up the yard. As during the previous hearing, the trial court gave Pierce "the discretion as to when to provide a key to" Stalker. (Appellant's App. p. 163).
Following this hearing, Stalker attempted to clean up the yard around his Bridgeton home. Independently, he sought the help of his friend, John Lapp (Lapp), and other church members to help him with the task. Stalker, Lapp, and Lapp's sons worked on the property each week and Stalker often rode his bicycle to Bridgeton to clean the yard by himself. Some of Stalker's acquaintances helped him with minor repairs to the exterior of his house.
On August 31, 2006, after Dr. Gonzalez' evaluation, the trial court held a status hearing to determine if Stalker's initial request to terminate the guardianship should be granted. Stalker was represented by his court-appointed attorney. Stalker submitted several photos of the yard around his residence to demonstrate his efforts in the cleanup. He reiterated his request for the keys to his residence so he could start the interior cleanup and again requested the guardianship to be terminated. At the hearing, Pierce conceded that the yard was "getting close" to being clean and acknowledged that she would be willing to provide Lapp with the keys to the home to begin supervising Stalker on his efforts to clean up the interior of the house. (Appellant's App. p. 220). Pierce *1100 represented that she was "willing to keep an open mind that at some point in time he might be able to be independent." (Appellant's App. p. 223). At the close of the evidence, the trial court denied Stalker's request to terminate the guardianship and ended the services of the court-appointed attorney. The trial court told Stalker that he "should be grateful to [Pierce] for performing this service" as "she has your best interest [at] heart" and informed him that it would consider reviewing the guardianship only if the circumstances changed in the future. (Appellant's App. pp. 224-25).
On September 7, 2006, seven days after the hearing and one day before Stalker's birthday, Pierce ordered Stalker's home excavated. That day, Stalker rode his bicycle to Bridgeton to mow the yard around his house. He had stopped at a nearby covered bridge that was under renovation to observe, take some photos, and to eat ice cream when someone notified him that he needed to go over to his house. When he arrived, he saw the wrecking crew ready to tear into the back of his home; they had already torn a hole in the back of the roof. Stalker found his framed World War I enlistment photo of his grandfather, which had previously hung in his dining room, lying on the ground in pieces.
David Collom (Collom), one of Stalker's acquaintances, was in a nearby store when he heard screaming at Stalker's home; he came running to see if somebody had been injured. He found Stalker "so hysterical it was hard for [him] to understand" Stalker. (Tr. p. 12). Collom and his son helped Stalker enter his house to retrieve some family pictures and personal belongings. He was only able to remove a few items before the police escorted him off the property. The excavation destroyed many of Stalker's sentimental items, including his little league pictures, his mother's funeral book, and a cabinet handcrafted by his father.
The excavation of his home came as a shock to Stalker. Pierce never told Stalker that she had contracted to have his house demolished and she never petitioned the trial court for permission. Consequently, Stalker never had an opportunity to collect his personal belongings from the house. When questioned about the excavation, Pierce stated that she did not recall if she had contacted the excavators prior to the August 31, 2006 hearing. She also did not recall if she had asked Stalker for a list of items that he wanted from his home prior to bulldozing it.
Although Pierce never sought court approval for the excavation of Stalker's home, she petitioned the trial court for approval to sell the vacant land. During the hearing on June 29, 2007, Stalker requested a continuance as he was not represented by an attorney. Pierce objected, stating that she was his guardian and claiming that she had merely provided notice of the hearing to Stalker as a courtesy as she was not mandated to do so. The trial court denied his request for a continuance but appointed counsel to independently review the sale of the property and the distribution of the proceeds. On August 2, 2007, the court-appointed attorney directed to review the sale of Stalker's property, submitted his report, recommending the sale of the real estate and the purchase of various items, including a vehicle for Stalker. On August 10, 2007, Stalker filed a pro se appeal requesting "to stay the sale of his property." (Appellant's App. p. 266). On August 13, 2007, we denied Stalker's "request to stay the court-ordered sale of his property." (Appellant's App. p. 266).
On August 11, 2007, Stalker's home was sold at a public auction for $37,500. Around the time of the public auction, *1101 Stalker travelled to Indianapolis opting to live homeless rather than to return to Rockville. To date, Stalker has not returned to reside in Bridgeton.
Because Stalker had received Medicaid and food stamps, Pierce had to spend down the proceeds from the sale of the real estate so that Stalker could remain eligible. On September 18, 2007, the trial court conducted a hearing on the distribution of the sale proceeds. Pierce requested to be reimbursed for the demolition of the house "that was condemned" in the amount of $6,999. (Appellant's App. 268). In addition, Pierce proposed to spend the funds on a prepaid funeral plan and a scooter. Stalker rejected these proposals and instead asked for the money to be spent on a vehicle and an attorney so he could have his brother be appointed guardian over him. The trial court denied Stalker's requests.
On September 4, 2008, two years after Stalker's home was demolished, Pierce filed a petition for leave to resign as Stalker's guardian. The trial court granted Pierce's petition and appointed Stalker's brother and Mental Health of America as successor guardians over Stalker's estate and person respectively. On March 18, 2009, Pierce filed her final accounting. After Stalker requested additional information on this final accounting, Pierce filed an amended version. On April 16, 2009, the trial court approved Pierce's amended accounting without a hearing.
On May 18, 2009, Stalker submitted his objections to the amended accounting alleging that Pierce had breached her fiduciary duty, had failed to act in his best interest, and had denied his due process rights. On April 21, 2010, after a hearing, the trial court issued its order approving Pierce's accounting and finding it "inequitable to award [Stalker] a judgment against [Pierce]." (Appellant's App. p. 13). On May 10, 2010, Stalker filed a motion to vacate the trial court's order and correct error. The trial court denied Stalker's motion to correct error on July 23, 2010.
Stalker now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

CROSS-APPEAL
Because Pierce presents us with a threshold procedural question, we will first analyze Pierce's argument on cross-appeal. Pierce contends that because Stalker filed an interlocutory appeal, all claims relating to events dating prior to the notice of appeal are barred pursuant to the law of the case doctrine. On the other hand, Stalker contends that the doctrine is not applicable as there has been no prior appellate ruling on the issues currently raised.
Initially, we observe that Pierce failed to raise this issue before the trial court and instead now raises it for the first time on appeal. Although the record of hearing conducted on April 21, 2010, on Stalker's objections to Pierce's final amended accounting reiterate the series of events commencing with the appointment of Pierce as Stalker's guardian, at no point did Pierce object on the ground that these testimonies and resulting claims were barred by the law of the case doctrine. As this claim is raised for the first time on appeal, we can principally waive Pierce's argument. See McGill v. Ling, 801 N.E.2d 678, 687 (Ind.Ct.App.2004), trans. denied. However, because of the importance of the case, we will address the merits of Pierce's cross-appeal.
The law of the case doctrine provides that an appellate court's determination of a legal issue binds both the trial court and the appellate court in any subsequent *1102 appeal involving the same case and substantially the same facts. Dutchmen Mfg., Inc. v. Reynolds, 891 N.E.2d 1074, 1082 (Ind.Ct.App.2008), trans. denied. The purpose of the doctrine is to minimize unnecessary relitigation of legal issues once they have been resolved by an appellate court. Id. Accordingly, all issues decided directly or by implication in a prior decision are binding in all further portions of the same case. Id. However, we also note that the law of the case doctrine is a discretionary tool. Id. To invoke this doctrine, the matters decided in the earlier appeal must clearly appear to be the only possible construction of an opinion. Id. Thus, questions not conclusively decided in the earlier appeal do not become the law of the case. Id. Moreover, statements that are not necessary in the determination of the issues presented are dicta, are not binding, and do not become the law of the case. Id.
The record reveals that on August 10, 2007, Stalker filed a pro se notice of appeal from the judgment entered during the June 29, 2007 hearing. During this hearing, Pierce sought and was granted the trial court's approval to sell Stalker's property. The trial court rejected Stalker's request for continuance of the hearing. Together with the notice to appeal the trial court's order, Stalker filed an affidavit in support of pauper status and, as characterized by this court, an emergency motion to stay in which Stalker to asked us to "stop the auctioning of [his] property so that [he] can get a new guardian/payee in place." (Appellant's App. p. 263). Three days later, on August 13, 2007, we issued an order denying Stalker's emergency request to stay the sale. As such, the only issue previously addressed by this court is whether the sale of Stalker's real estate could be stayed. Because Stalker's claims raised on appeal are not related to this stay, we find that the law of the case doctrine is not applicable.
Nevertheless, the online docket of our court reflects that on July 17, 2008, we dismissed with prejudice Stalker's appeal to the trial court's order approving the sale, filed on August 10, 2007. It is generally recognized that a dismissal with prejudice is a dismissal on the merits. MBNA America Bank, N.A. v. Kay, 888 N.E.2d 288, 292 (Ind.Ct.App.2008). As such it is conclusive of the rights of the parties and res judicata as to the questions which might have been litigated. Id. Therefore, as we dismissed Stalker's appeal with prejudice, any questions arising from the limited issue of the trial court's approval to sell the real estate is foreclosed for our review. With these parameters in mind, we turn to Stalker's appeal.

APPEAL
In his appeal from the trial court's denial of his motion to correct error, Stalker contends that the trial court abused its discretion by determining that it would be inequitable to award damages to Stalker for Pierce's demolition of his home and personal belongings. To that end, Stalker presents this court with two main questions: (1) whether Pierce breached her fiduciary duty as Stalker's guardian in the management and preservation of Stalker's property; and (2) whether Pierce violated Stalker's due process rights when she decided to demolish Stalker's home and personal belongings.

I. Standard of Review

A trial court has discretion to grant or deny a motion to correct error and we reverse its decision only for an abuse of that discretion. Chapo v. Jefferson Co. Plan Comm'n, 926 N.E.2d 504, 507 (Ind.Ct.App.2010). An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and *1103 circumstances before the court or if the court has misinterpreted the law. Id.

II. Fiduciary Duty

With respect to the first issue, Stalker makes a two-fold contention: (1) Pierce unilaterally "orchestrated" the destruction of Stalker's personal and real property, including his family home, contrary to her duty to protect and preserve his property and to manage it in his best interests; and (2) Pierce breached her duty of loyalty to Stalker and took actions that directly conflicted with her statutory duties as enumerated in the Probate Code. (Appellant's Br. p. 21).

A. Duty to Protect, Preserve, and Manage

Pierce's fiduciary duties as a guardian derive from statutory provisions. Indiana Code section 29-3-1-6 provides that a "guardian" is a "person who is a fiduciary and is appointed by a court to be a guardian or conservator responsible as the court may direct for the person or the property of an incapacitated person or a minor." A guardian has a statutory duty to manage the property for the ward's best interest, and he is responsible to protect and preserve the property of the protected person. See I.C. § 29-3-8-3(2); Wells v. Guardianship of Wells, 731 N.E.2d 1047, 1051-52 (Ind.Ct.App.2000), trans. denied. Additionally, the guardian must conserve any property of the protected person in excess of the protected person's current needs. I.C. § 29-3-8-3(3). In order to perform his or her responsibilities, the guardian must become sufficiently acquainted with the protected person and maintain sufficient contact with the protected person to know of this person's capabilities, disabilities, limitations, needs, opportunities, and physical and mental health. See I.C. § 29-3-8-1(a)(1); (b)(1). The degree of care and prudence required of a guardian, acting without fraud, is not higher than that which an ordinarily prudent man exercises in his own affairs of a like nature. Slanter v. Favorite, 107 Ind. 291, 4 N.E. 880, 882 (1886); Wainwright v. Burroughs et al., 1 Ind.App. 393, 27 N.E. 591, 593 (1891); Fletcher Trust Co. v. Hines, 211 Ind. 111, 4 N.E.2d 562, 565 (1936).
Our review of the record reflects that although Stalker initially consented to the appointment of a guardian, he actively voiced his displeasure seven months after Pierce's appointment when he perceived that she did not have his best interests in mind. At every opportunity throughout these proceedings, Stalker unsuccessfully requested the trial court to be released from the guardianship.
After the Parke County Health Department found his home unfit for human habitation, upon a complaint filed by Pierce, Pierce found Stalker a new apartment in Rockville, ten miles away from his home. While aware of the Health Department's order to get the property cleaned, Pierce also knew that Stalker's only mode of transportation was a bicycle which would make traveling back and forth to his home almost impossible in winter and would make compliance with the order difficult. In addition, Pierce refused to give Stalker the keys to the house until he had cleared the outside of his property.
Following a review hearing of March 17, 2006, Stalker began actively cleaning the outside of the property with the help of friends and church members. Some of Stalker's acquaintances helped him with minor repairs. On August 31, 2006, Pierce conceded to the trial court that the yard was "getting close" to being clean and acknowledged that she would be willing to give the keys to Stalker's house to a third party to begin supervising the interior clean-up effort. (Appellant's App. p. 220).
*1104 Nevertheless, on September 7, 2006, seven days after Pierce's concession, Pierce issued a unilateral order to demolish Stalker's family home. No advance notice was given to Stalker; he just happened to arrive at his house to mow his yard. The wrecking crew had already torn into his house and Stalker's prized possessiona World War I enlistment photo of his grandfatherwas strewn into the yard in the immediate path of an oncoming truck. Stalker became hysterical. Even though an acquaintance helped Stalker retrieve some family pictures and some limited personal belongings, Stalker was never given an opportunity to collect all his sentimental items out of his home. Pierce never had a third party enter the house prior to its destruction to determine which belongings could be salvaged. Around the time of the public auction of Stalker's property, Stalker became so disheartened that he fled to Indianapolis and opted to live homeless. Upon the sale of Stalker's real estate, Pierce used the proceeds to buy items Stalker explicitly did not want.
In her appellate brief, Pierce does not dispute that she tore down Stalker's home seven days after conceding that he might soon be able to start an interior cleanup effort; that she failed to give him any notice of the destruction of his home and property; or that she represented to the trial court that Stalker's home had been condemned while no such condemnation notice was ever issued by the Health Department. Pierce contends though that "the destruction actually improved the value of the land by a factor of ten. Prior to the house being torn down, the property was valued at $3,600.00. After the house was torn down, the property was sold for $37,500.00." (Appellee's Br. p. 19). During the hearing on Pierce's amended accounting, Pierce admitted that she had never secured a written appraisal of Stalker's property but had merely asked a local realtor friend for a "drive by appraisal." (Tr. p. 97). In support of her contention on appeal, Pierce refers to an undated "market analysis report," which was never entered into evidence by the trial court and as such cannot be considered by the court. (Appellant's App. p. 424). Regardless, the report does not support Pierce's argument but only attempts to determine the fair market value of the property after the removal of the home. To that end, the report indicates that because of its close location to the epicenter of the Bridgeton Covered Bridge Festival, the "property could be worth as little as $35,000 to $40,000 or it could bring closer to $150,000-$200,000." (Appellant's App. p. 425). Furthermore, part of Pierce's argument with respect to the pre-demolition value of the property is based on the property's assessed value for tax purposes. Nonetheless, it should be noted that Indiana's property assessment law explicitly provides that "[w]ith respect to the assessment of real property, true tax value does not mean fair market value." I.C. § 6-1.1-31-6(c).
Moreover, Pierce's claim that she destroyed Stalker's home because it was a "threat to his well-being" does not find support in the record. While the house was found to be uninhabitable by the Health Department until it was cleaned up and repaired, the Health Department never condemned the house, nor did the trial court ever declare it to be such a threat that it had to be demolished. Rather, on August 31, 2006, the trial court indicated that Stalker was making progress and Pierce conceded that Stalker might soon advance to tackling the interior clean up of the home. In addition, while Stalker's request for aid from CAP's program was turned down because the extent of the repairs exceeded "the program's financial *1105 capacity[,]" CAP never stated that the house could not be renovated. (Appellant's App. p. 144). In fact, the record is completely devoid of any evidence that Stalker's home was beyond salvage.
Based on the evidence presented to us, we conclude that Pierce breached her fiduciary duty to protect, preserve, and manage Stalker's property. While we have no doubt that the guardianship started out with the best intentions, the relationship appeared to turn sour when Stalker forcefully started to object to the direction of the guardianship. The guardianship went off-track and became a bad fit down the road between Pierce and Stalker; instead of working with Stalker to address his concerns and issues, Pierce actively started to work against him, taking unilateral decisions without keeping Stalker's bests interests at heart. We find the degree of care and prudence displayed by Pierce in her decisions as a guardian was well below that which an ordinarily prudent person would exercise in her own affairs. See Slanter, 4 N.E. at 882. We are dismayed at her callousness to demolish Stalker's property without getting a formal appraisal, without notifying Stalker or the court, and most importantly without providing him with an opportunity to, at the very least, collect his sentimental possessions. We are convinced that Pierce would not have made similar choices with respect to the management of her own property. Pierce's unwarranted and unreasonable decisions, made contrary to Stalker's best interests, resulted in emotional upheaval and homelessness. As such, we find that she breached her fiduciary duty to protect, preserve, and properly manage Stalker's property.

B. Duty of Loyalty

Second, Stalker argues that Pierce breached her duty of loyalty "by taking actions against his property that were not solely in [Stalker's] best interest but instead in the interests of Parke County and the Parke County Board of Health with which she had a conflicting interest in the demolition of [Stalker's] home." (Appellant's Br. pp. 29-30).
One of the enumerated, mandatory responsibilities of a guardian is to act "with respect to the guardianship property and observe the standards of care and conduct applicable to trustees." I.C. § 29-3-8-3. With respect to the correlating standard of care and conduct of a trustee, it should be noted that:
If the duty of the trustee in the exercise of any power conflicts with the trustee's individual interest [], the power may be exercised only under one of the following circumstances:
(1) The trustee receives court authorization to exercise the power with notice to interested persons as the court may direct.
(2) The trustee gives notice of the proposed action in accordance with [I.C. §] XX-X-XX-XX and;
(A) the trustee receives the written authorization of all interested persons to the proposed action within the period specified in the notice of the proposed action; or
(B) a beneficiary objects to the proposed action within the period specified in the notice of the proposed action, but the trustee received court authorization to exercise the power.
(3) the exercise of the power is specifically authorized by the terms of the trust.
I.C. § 30-4-3-5(a). In addition, any "transaction involving the property that is affected by a substantial conflict between the interest of the protected person and the guardian's personal interest is void *1106 unless approved by the court." I.C. § 29-3-8-2 to 5(2).
Stalker focuses on two separate situations that created a conflict of interest which breached Pierce's fiduciary duty of loyalty to him. First, Stalker references Pierce's complaint about the condition of his home to the Parke County Board of Health and argues that this action is "in direct conflict with his interests by using information she obtained while serving as a guardian to file a complaint against him[.]" (Appellant's Br. p. 32).
In her testimony, Pierce admitted to being a member of the Parke County Board of Health. She stated that after she had become Stalker's guardian, she "went to check on him." (Tr. p. 78). Upon entering the home, she noticed its condition, and she filed a complaint with the Department of Health. The record is devoid of any evidence that Pierce notified Stalker of her intention to file a complaint. When the Department of Health sent an inspector to Stalker's home, Pierce "did go with the health inspector" and insisted that Stalker grant them entry. (Tr. p. 79). We agree with Stalker that Pierce used the information she gleaned as his guardian to fulfill her duties as a member of the Parke County Board of Health. We conclude that by disclosing information she obtained about Stalker's house without prior court approval or notice, Pierce's duty as guardian conflicted with her personal obligations as a member of the Board of Health. See I.C. § 29-3-8-2 to 5(2); I.C. § 30-4-3-5(a).
Next, Stalker contends that "[b]ecause Pierce's personal and fiduciary duty owed to the Parke County Board of Health conflicted with her fiduciary duty owed to [Stalker] as his court-appointed guardian, she was required to observe the same standard of care and conduct applicable to a trustee and seek prior court authorization before unilaterally demolishing [Stalker's home]." (Appellant's Br. p. 31). We disagree. There is no evidence in the record, nor does Stalker direct us to any, establishing that at the moment Pierce decided to demolish the home, she was acting as a member of the Board of Health. We agree that there is testimony that Pierce represented to the trial court that Stalker's residence had been condemneda representation which was untruehowever, this does not indicate that she was acting in a different capacity than as Stalker's guardian. While there was a personal conflict between Pierce and Stalker, this dispute centered upon their respective viewpoints as to what should be done with the property; it was not a conflict between Pierce's respective fiduciary duties.
In sum, based on the evidence presented to us, we conclude that Pierce, as Stalker's guardian, breached her fiduciary duty to protect, preserve, and properly manage Stalker's property and her fiduciary duty of loyalty to Stalker when Pierce's duty as guardian conflicted with her responsibilities as a member of the Board of Health. As such, we remand to the trial court for a determination of his harm and award damages, if any.

III. Due Process

Stalker's main argument with respect to his procedural due process rights revolves around the destruction of his home and personal belongings. Specifically, he maintains that because the tearing down of his house permanently deprived him of the home and his possessions, Pierce should have sought prior court approval and given him notice. As she failed to do so, Stalker maintains that Pierce violated his due process rights.
Initially, we need to address Pierce's claim that she could not have deprived *1107 Stalker of his due process rights under the Fourth Amendment because she is a private individual. However, Stalker filed his complaint against Pierce in her capacity as his guardian. Ever since Euler v. Euler, 55 Ind.App. 547, 102 N.E. 856, 861 (1913), we have consistently held that "[a] guardian is an officer of the court, and a duty rests upon him, when making his reports, to truthfully make a full disclosure to the court of all matters of which he has knowledge which materially affect his trust[.]" This precedent was later included in I.C. § 29-3-1-6, which provides that a guardian "is appointed by a court." Therefore, because Stalker complains about acts undertaken by Pierce in her capacity as his guardian, she acted at all times as a government officer who may be held liable for breaching a person's due process rights. (See, e.g., Bowlby v. NBD Bank, 640 N.E.2d 1095, 1098 (Ind.Ct.App. 1994), trans. denied ("the acts of a court-appointed receiver are state action for due process purposes")).
Turning to Stalker's argument, we are mindful of the premise that any "transaction involving the property that is affected by a substantial conflict between the interest of the protected person and the guardian's personal interest is void unless approved by the court." I.C. § 29-3-8-2 to 5(2). In the instant case, there was a very clear and explicit conflict between Stalker's interest and Pierce's interest with respect to Stalker's property. From the very beginning and throughout the proceedings, Stalker wanted to improve his home. After he was forced to leave his residence and to reside in an apartment in Rockville, his only incentive became to return to his property. As soon as he was able, he commenced the clearing of the outside, did some repairs, and continued to request the keys to the house to start the interior cleanup. Although Pierce initially helped Stalker with his finances in hopes to get the house remodeled, at some point during the guardianship, Pierce's goal changed: she unilaterally decided to sell the property and determined that Stalker's house had to be demolished. Pierce testified that she had a drive-by appraisal done by a friend realtor who "thought the property would bring more without the house because of the condition of the house." (Tr. p. 97). As such, there was a clear conflict between Pierce, who wanted to demolish the house and sell the property, versus Stalker, who wanted to return to his home. Because the evidence reflects that the destruction of Stalker's home was an intricate part of the sale of his property, Pierce should have requested prior court approval. See I.C. § 29-3-8-2 to 5(2).
"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). It is undeniable that a hearing to request permission to demolish Stalker's home and to sell his property is final. Thus, before an action affecting a party's interest in life, liberty, or property protected by the Due Process Clause of the Fourteenth Amendment proceeds, reasonable notice must be given. See In re M.L.K., 751 N.E.2d 293, 296 (Ind.Ct.App.2001). Such notice must reasonably convey the required information to the affected party, must afford a reasonable time for that party to respond, and is constitutionally adequate when the practicalities and peculiarities of the case are reasonably met. Id.
*1108 The record supports an abundance of evidence that Pierce never notified Stalker of her intention to demolish the house and sell the property or that she ever requested the trial court for permission. Rather, during a status hearing seven days before the scheduled destruction of Stalker's home, Pierce conceded that Stalker had made sufficient progress in the cleanup of the yard to contemplate providing the keys to the house to a third party and start the interior cleanup. She acknowledged to the court that she was "willing to keep an open mind that at some point in time [Stalker] might be able to be independent." (Appellant's App. p. 223). At no point during the hearing did Pierce indicate that in seven days time Stalker's residence would be leveled to the ground.
We are mindful that even though Pierce was Stalker's guardian and was responsible for his person and property this does not diminish her obligation to give Stalker, as the protected person, notice. See Gillispie v. Darroch, 57 Ind.App. 482, 107 N.E. 475, 479 (1915). Because no notice was ever given to Stalker, we conclude that Pierce, in her capacity as guardian, violated Stalker's due process rights. As such, Stalker is entitled to damages. See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 389, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[1]

CONCLUSION
Based on the foregoing, we conclude that Pierce breached her fiduciary duties to Stalker and violated Stalker's due process rights. Therefore, we remand to the trial court with instructions to determine the amount of damages due to Stalker.
Reversed and remanded for further proceedings.
DARDEN, J., concurs and BARNES, J., concurs in result.
NOTES
[1] As a second, minor prong of his due process argument, Stalker contends that Pierce caused multiple procedural irregularities in the destruction of Stalker's property and in the institution of guardianship proceedings which all resulted in a violation of his due process rights. Specifically, Stalker focuses on Pierce's motion to vacate a hearing on Stalker's incompetency; no guardian ad litem was ever appointed when Stalker appeared pro se at hearings; Pierce did not file a bond as mandated by I.C. § 29-3-7-1; Pierce failed to file Stalker's confidential mental health records under seal in accordance with I.C. § 5-14-3-4(a)(9); Pierce never filed any biennial or inventory accounting as required by I.C. § 29-3-9-6. While we do not discount these perceived errors, we do not need to address them on their merits as we choose to decide the due process issue based on the lack of notice.