## FOR PUBLICATION



FILED

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**THOMAS E. DENSFORD**
**ALICIA C. SANDERS**
Bauer & Densford
Bloomington, Indiana

ATTORNEYS FOR APPELLEE:

**GEOFFREY M. GRODNER**
**KENDRA G. GJERDINGEN**
Mallor Grodner, LLP
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

DEAN V. KRUSE FOUNDATION, INC., )
DEAN KRUSE and KRUSE INTERNATIONAL, )
           )
  Appellants-Defendants, )
           )
     vs. )  No. 59A05-1201-CT-37
           )
JERRY W. GATES, )
           )
  Appellee-Plaintiff. )

APPEAL FROM THE ORANGE CIRCUIT COURT
The Honorable Roger D. Davis, Special Judge
Cause No. 59C01-0610-CT-312

**August 7, 2012**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellants-Defendants/Counterclaim Plaintiffs, Dean V. Kruse Foundation (Foundation), Dean V. Kruse (Kruse), and Kruse International (collectively, the Kruse Parties), appeal the trial court's judgment against Appellee-Plaintiff/Counterclaim Defendant, Jerry W. Gates (Gates).

We reverse and remand with instructions.

## ISSUE

The Kruse Parties raise two issues on appeal, which we consolidate as the following issue: Whether the trial court erred when it interpreted the parties' agreement to contain a liquidated damages clause.

## FACTS AND PROCEDURAL HISTORY

The Foundation is a charitable organization operating a World War II and automobile museum in Auburn, Indiana. In 2003, Kimball International donated its furniture factory, a 42.79-acre parcel of real estate with a 300,000 square foot manufacturing facility, located in West Baden, Indiana, to the Foundation. Although the facility housed at least one tenant, the high cost of maintaining the property adversely impacted the Foundation. The Foundation encountered a number of difficulties, including the payment of property taxes, utility bills, and insurance as well as theft and vandalism. The Foundation continued to lose money on the property, and had to take out loans and requesting advances from a tenant to pay expenses.

2

Beginning in 2004 or 2005, the Foundation made a number of attempts to sell the property. Although the property was sold once, the Foundation later took back the property because the buyer failed to make payments. In March 2006, the Foundation retained Colliers Turley, Martin, Tucker (Colliers), a real estate broker, to list and market the property. Colliers conducted a market survey for the property, providing three values for the property based on three classifications of potential buyers. The first tier of potential buyers included those who would make the highest and best use of the property, *i.e.*, as an income producing property, resulting in a sales range of $4.5 million to $5.2 million. The second tier included those buyers who would put the property to secondary uses. The value range in this case was between $3.5 million and $4.5 million. The third tier of potential buyers consisted of speculators for whom the property had a value range of $2 million to $3.5 million. Based on these values, Colliers generated an asking price of $5,750,000 for the property.

Thereafter, Colliers was unsuccessful in locating a buyer. Kruse, an auctioneer and licensed real estate broker, decided to auction the property. Kruse believed the property to be worth five million dollars given its size, which even then was a "junk price." (Transcript p. 129). Kruse International and Colliers conducted marketing efforts advertising the auction.

On July 12, 2006, the property was auctioned on site. The auction was conducted as a final, rather than as a reserve, auction. Each bidder received a brochure, disclosures, a bidder's agreement, and the Purchase Agreement, which was a standardized agreement

3

from the Indiana Realtors Association. The terms of the Purchase Agreement were published in the packet, including the amount of earnest money and the date of closing. According to Kruse, "[e]very single bidder" had to sign the documents in order to qualify as a bidder. (Tr. p. 122). Seven to nine bidders registered and four to six bidders participated, including Gates. Gates was a professional and experienced real estate developer, whom Kruse had known and served with on the Board of the Indiana Association of Realtors for many years. At the end of the bidding process, Gates was the high bidder with a bid of $4 million, which, with a 5% buyer's premium, resulted in a purchase offer of $4,200,000. Thereafter, both Gates and Kruse filled out the blank portions of the Purchase Agreement.

> The Purchase Agreement provided, in relevant part, as follows:

> [Buyer] agrees to pay therefore the sum of Four Million Dollars ($4,000,000) on the following terms: Cash At Closing Plus 5% Buyers Premium[.] One Hundred Thousand Dollars ($100,000) of said purchase price is hereby deposited as earnest money with Kruse Real Estate[,] same to be refunded if the above offer is not accepted on or before today or if the title to the above property is found defective and said defects cannot be remedied within a reasonable time. However, if the buyer fails to complete the purchase within a reasonable time due to no fault of the seller, then the earnest money deposited is forfeited, and seller may sue for specific performance.

(Appellant's App. p. 27).

On August 9, 2006, Gates informed the Kruse Parties in writing that he was terminating the Purchase Agreement. Prior to that, Kruse spoke with Gates regarding problems with the property's title and condition. Gates expressed his reluctance to handle

a large project. Kruse threatened specific performance of the Purchase Agreement, which Gates rebuffed.

Subsequently, Kruse and Colliers contacted the other bidders and other potential buyers of the property. Through the combined efforts of Colliers and the Kruse Parties, over a thousand potential buyers, ranging from institutional to individuals, were solicited for offers. In the end, Colliers received an offer for $5 million, which fell through for lack of financing; an offer for $1.1 million, which was rejected for being too low; and one offer of $2 million, to which Colliers and the Kruse Parties made a counter-offer of $3.5 million. The $1.1 million and $2 million offers were both made in September 2006, and written on the same form as the Purchase Agreement. Ultimately, the Kruse Parties and French Lick-West Baden Development Park, the latter offeror, agreed upon a sales price of $2,350,000 and executed a purchase agreement.

On October 4, 2006, Gates filed suit against the Kruse Parties and Colliers for breach of contract, fraud, and conversion. On November 27, 2006, The Kruse Parties filed a counterclaim for breach of contract and slander of title. On February 27, 2009, Gates moved for partial summary judgment on the breach of contract claims. On July 10, 2009, the Kruse parties filed their response and cross-motion for partial summary judgment on breach of contract, fraud, and conversion. On December 21, 2009, the trial court granted summary judgment in Gates' favor and the Kruse Parties were ordered to return the earnest money with interest.

The Kruse Parties appealed. In *Dean V. Kruse Foundation v. Gates*, 932 N.E.2d 763 (Ind. Ct. App. 2010), *trans. denied* (*Kruse I*), we reversed the trial court and remanded with instructions to enter summary judgment in favor of the Kruse Parties on Gates' breach of contract claim as well as on the Kruse Parties' breach of contract, fraud, and conversion claims. Further, we instructed the trial court to hold a hearing on the appropriate amount of damages. On August 5, 2011, Gates' guardians were substituted by joint stipulation, and on August 19, 2011, the trial court entered a summary judgment order in favor of the Kruse Parties.

On December 2, 2011, the trial court held a hearing on damages. The Kruse Parties sought damages in the amount of $2,468,794. This amount was based on the difference between the purchase price in the Purchase Agreement ($4 million) and the purchase price from the subsequent sale of the property to French Lick-West Baden Development LLC ($2,350,000). In addition, the Kruse Parties sought the buyer's premium of $200,000 and prejudgment interest in the amount of $718,794. The amount of $100,000, the earnest money deposit, was credited against the foregoing.

On December 20, 2011, the parties filed their Joint Request for Court to Enter Judgment. On January 3, 2012, the trial court issued its Entry Determining Damages as Required by the Court of Appeals. The trial court awarded damages to the Kruse Parties in the amount of $100,000 based on its conclusion that the Purchase Agreement contained a liquidated damages provision coupled with an option for the Kruse Parties to

6

pursue specific performance against Gates. In particular, the trial court concluded as follows.

> In this case the amount of $100,000.00 is not grossly excessive or unjust considering the four million dollar purchase price. The trial court finds the evidence as to the value of the property was uncertain. The [c]ourt also finds the property in question may have been sold for more if a longer period of time were available to market it. Mr. [Luke] Wessel [(Wessel) of Colliers] testified the value of the property was $3.5 million after the sale fell through with Gates. Therefore, the damages were uncertain. Any certainty arises solely from the sale of the property to a different buyer.

> Regarding the evaluation of whether the $100,000.00 provision is a liquidated damages clause or a penalty, the trial court notes the Kruse [P]arties would be required to mitigate damages if they were entitled to claim legal damages. The trial court heard evidence at trial for damages from Mr. Wessel and the evidence was far from clear regarding the value of the property before the sale to Gates and the value after the sale fell through.

> Mr. Wessel testified as to value before the sale to Gates and gave his opinion of the value in ranges. For highest and best use the range was $4.5 to $5.2 million. For secondary use the range was $3.5 to $4.5 million for speculator price the range was $2.0 to $3.5 million. Mr. Wessel testified that the two top tiers (other than the speculator price) would be 90% of prospective buyers. Mr. Wessel's opinion of value of the property in September of 2006 after the sale fell through was $3.5 million. Mr. Kruse had been initially advised the property would bring $4-5 million and it was listed for $5.75 million. The uncertainty regarding the value of the property and what it could be sold for within a certain time frame supports a conclusion that the ease of determining actual damages in this case is not what it may seem on the surface.

> The trial court finds the provisions in the [P]urchase [A]greement prepared by the Kruse Parties to be unambiguous regarding what was to happen in the event of a breach by the purchaser. The Seller "may sue for specific performance[."] The Kruse [P]arties elected not to pursue specific performance. Also, the Seller got to keep the $100,000.00. It was "forfeited[."] Nothing more was provided in the way of remedies for the purchaser's breach of the contract prepared by the Kruse Parties and the document had an integration clause that it contained "all the terms and

7

conditions agreed upon" and there were no others "not stated in this instrument[."] The court should give unambiguous liquidation clauses "force and effect[."] [*See Beck v. Mason*, 580 N.E.2d 290, 294 Ind. Ct. App. 1991)].

The trial court finds and concludes the $100,000.00 provision in the [P]urchase [A]greement prepared by the Kruse Parties was a liquidated damages clause and the Kruse Parties chose not to pursue specific performance. The [P]urchase [A]greement did not provide for any further remedies and the [P]urchase [A]greement contained all of the terms, conditions, and agreement of the parties according to the language of the [P]urchase [A]greement. The [P]urchase [A]greement was prepared by the Kruse Parties. The Kruse Parties were sophisticated and experienced in commercial real estate transactions. Therefore since the Kruse parities have already received the $100,000.00 the trial court finds they are not entitled to anything further. The trial court finds the Kruse Parties damages to be $100,000.00 pursuant to the [P]urchase [A]greement prepared by the Kruse Parties.

(Appellant's App. pp. 9-12).

The Kruse Parties now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Here, the parties jointly requested an entry of judgment, and the trial court issued its Entry Determining Damages as Required by the Court of Appeals, which contains findings of fact and conclusions of law. Ind. Trial Rule 52(A) governs the trial court's use of findings and conclusions when matters are adjudicated at a trial by the court without a jury. Pursuant to T.R. 52(A), we will set aside the judgment only upon a showing that the judgment is clearly erroneous. *Ream v. Yankee Park Homeowner's Ass'n, Inc.*, 915 N.E.2d 536, 540 (Ind. Ct. App. 2009), *trans. denied.* In determining whether a judgment is clearly erroneous, we will neither reweigh the evidence nor

8

determine the credibility of witnesses, but will consider only the evidence supporting the judgment and the reasonable inferences to be drawn from that evidence. *Id*. Where, as here, the trial court has issued written findings and conclusions, we engage in a two-tiered review, determining first, whether the evidence supports the findings and second, whether the findings support the judgment. *Id*. In deference to the trial court's proximity to the issues, we will disturb the judgment of the trial court only where there is no evidence supporting the findings or the findings fail to support the judgment. *Id*. However, when a question of law is dispositive, we owe no deference to the trial court and review the issue *de novo*. *Id*.

The issue before us is whether the forfeiture provision in the Purchase Agreement constitutes liquidated damages or an unenforceable penalty. "The question whether a liquidated damages clause is valid, or whether it constitutes a penalty, is a pure question of law for the court." *Gershin v. Demming*, 685 N.E.2d 1125, 1128 (Ind. Ct. App. 1997). The trial court interpreted the Purchase Agreement to contain a liquidated damages clause thereby limiting the Kruse Parties' damages to the earnest money deposit.

On appeal, the Kruse Parties contend that the forfeited earnest money deposit constituted a penalty, rather than liquidated damages. In support of this interpretation the Kruse Parties assert that (1) the parties intended that the earnest money was to secure performance of Gates' obligation to purchase the property; (2) their damages were ascertainable; and (3) the language of the Purchase Agreement did not limit their remedies for breach solely to retention of the earnest money and specific performance.

9

Arguing in support of the trial court's ruling, Gates contends that the forfeited earnest money deposit represents liquidated damages as evidenced by (1) our opinion in *Kruse I*, which Gates contends determined the forfeiture provision to be a liquidated damages clause; (2) the Kruse Parties' refusal to return the earnest money following breach; and (3) interpretation of the forfeited earnest money as an unenforceable penalty would render other provisions of the Purchase Agreement meaningless.

## II. *Law of the Case*

We first address Gates' argument that because this court's opinion in *Kruse I* impliedly found the forfeited earnest money to be liquidated damages, the law of the case doctrine precludes further consideration of this issue. Specifically, because this court recognized that the earnest money was forfeited under the Purchase Agreement, Gates contends that this court by implication must have first concluded that the forfeiture provision equated to an enforceable liquidated damages provision. As a result, Gates argues that the issue has been decided and the law of the case precludes our further consideration of whether the forfeited earnest money constitutes liquidated damages or a penalty.

The law of the case doctrine provides that an appellate court determination of a legal issue is binding on the trial court and this court in any subsequent appeal in the same case and involving the same facts. *In re Guardianship of Stalker*, 953 N.E.2d 1094, 1101-02 (Ind. Ct. App. 2011). The purpose of the doctrine is to minimize unnecessary relitigation of legal issues once they have been resolved by an appellate court. *Id*. at

10

1102. All issues decided directly or by implication in a prior decision are binding in all further portions of the same case. *Id*. However, we also note that the law of the case doctrine is a discretionary tool. *Id*. To invoke this doctrine, the matters decided in the earlier appeal must clearly appear to be the only possible construction of an opinion. *Id*. Thus, questions not conclusively decided in the earlier appeal do not become the law of the case. *Id*. Moreover, statements that are not necessary in the determination of the issues presented are dicta, are not binding, and do not become the law of the case. *Id*.

We find that the law of the case doctrine does not apply for the following reasons. First, *Kruse I* does not analyze whether the forfeiture clause at issue is a liquidated damages clause; it merely noted that under the express terms of Purchase Agreement the earnest money is forfeited. *Kruse I*, 932 N.E.2d at 767, 769. Second, the issues before us in *Kruse I* were expressly limited to those raised by the parties in their respective motions for summary judgment. Those included 1) whether either party breached the Purchase Agreement; 2) whether the Kruse Parties committed fraud; and 3) whether the Kruse Parties' retention of the earnest money constituted conversion. *See Kruse I*, 932 N.E.2d at 767-69. For the third issue, this court reasoned that Gates could not show that the Kruse Parties were "aware that there was a high probability that [their] control over the property was unauthorized," since retention of the earnest money "was expressly allowed under the contract in the event of the purchaser's breach." *Id*. at 769. We therefore found that Kruse was "contractually entitled to keep the earnest money when Gates refused to close the sale." *Id*.

11

Gates' argument assumes that retention of earnest money forecloses any other monetary remedy. If anything, *Kruse I* would seem to imply that the provision at issue was a penalty as evidenced by this court's remand for consideration of the damages issues.

> In their counterclaim, the Kruse Parties request "all damages incurred as a result of the breach … including all transaction costs, auction fees, buyer premiums, realtor commissions, costs of collection and reasonable attorney fees, and for all other proper relief. Because the record before us does not include this information, we reverse and remand for a determination of damages.

*Id*. at 768 (internal citations omitted). In light of the foregoing, we find that the issue was not decided directly or by implication. Therefore, the law of the case doctrine does not preclude our subsequent determination.[1]

## III. *Liquidated Damages*

A liquidated damages clause provides for the forfeiture of a stated sum of money upon a breach of contract without proof of damages. *Rogers v. Lockard*, 767 N.E.2d 982, 990 (Ind. Ct. App. 2002). Liquidated damages clauses are generally enforceable where the nature of the agreement is such that damages for breach would be uncertain, difficult, or impossible to ascertain. *Id*.

---

[1] Gates also argues that the Kruse Parties impliedly argued that the earnest money was liquidated damages in *Kruse I* and to assert the opposite now is incongruous with their prior position. However, the opinion in *Kruse I* contains no mention that the Kruse Parties asserted that the forfeited earnest money constituted liquidated damages, but merely mentions that the Kruse Parties sought damages for Gates' breach.

While liquidated damages clauses are ordinarily enforceable, contractual provisions constituting penalties are not. *Id*. at 991. The distinction between a penalty provision and one for liquidated damages is that a penalty is imposed to secure performance of the contract and liquidated damages are to be paid in lieu of performance. *Gershin*, 685 N.E.2d at 1128. To determine whether a stipulated sum payable upon breach of contract constitutes liquidated damages or a penalty, the facts, the intention of the parties, and the reasonableness of the stipulation under the circumstances of the case are all to be considered. *Id*. The use of the words "damages," "penalty," "forfeiture," and "liquidated damages" are not conclusive, but should be considered in connection with other provisions in the contract to determine the nature of the provisions. *Rogers*, 767 N.E.2d at 991. However, despite the plethora of abstract tests and criteria for the determination of whether a provision is one for a penalty or liquidated damages, there are no hard and fast guidelines to follow. *Id*.

A. *Purchase Agreement*

Here, the Purchase Agreement does not label the forfeited earnest money as liquidated damages. Instead, the Purchase Agreement only provides that the earnest money is part of the purchase price, forfeitable upon breach by Gates. The parties cite to three cases to identify relevant characteristics analogous to the kind of contractual provision involved in this case. However, only one of these cases involves a contractual provision not expressly referred to as liquidated damages and none address a sale conducted in the manner as was done in this case.

13

In *Mandel v. Owens*, 330 N.E.2d 362, 363 (Ind. Ct. App. 1975), *trans. denied*, we considered a provision in a residential housing purchase agreement that called for forfeiture of earnest money in the event of the purchaser's breach. The purchaser failed to complete the transaction and the seller brought suit to collect its damages. *Id*. The agreement provided that the earnest money constituted part of the purchase price but was otherwise silent on whether the earnest money was liquidated damages. *Id*. at 366. The court could not determine from the language whether the forfeiture provision constituted liquidated damages or a penalty. *Id*. Relying upon the presumptions that "a lump sum named by the parties to a contract is a penalty rather than liquidated damages" and that ambiguities in the contract must be construed against the drafter, the court ultimately concluded the provision was an unenforceable penalty. *Id*.

In *Rogers v. Lockard*, 767 N.E.2d 982 (Ind. Ct. App. 2002) and *Beck v. Mason*, 580 N.E.2d 290 (Ind. Ct. App. 1991), the court reviewed contractual provisions expressly cast as liquidated damages. *Beck* also involved the sale of residential real estate, with the purchaser providing a $1,000 deposit on the property. *Id*. at 291. The purchase agreement explicitly labeled the deposit as "liquidated damages and not as a penalty or forfeiture." *Id*. The purchasers did not obtain financing and requested return of the deposit. *Id*. The seller kept the deposit and sued for actual damages, claiming that the deposit, even as liquidated damages, did not preclude recovery of their actual damages. *Id*. Though concluding that a liquidated damages clause does not necessarily bar additional damages, the court held that the provision at issue reflected the parties' intent

14

that the deposit constituted liquidated damages because of its express labeling as such. *Id*. at 293.

In *Rogers*, the court considered a provision that expressly labeled earnest money as liquidated damages, but also permitted the sellers to seek their legal and equitable remedies. *Rogers*, 767 N.E.2d at 989. In its interpretation of a residential real estate contract, the court compared its provision to that appearing in *Mandel* and *Beck*. *Id*. at 991-92. It distinguished *Beck* by concluding that the addition of the sellers' right to seek equitable and legal remedies rendered an interpretation of the provision as a liquidated damages clause inconsistent. *Id*. at 991. As a result, the court concluded that the provision operated as punishment for the purchaser's breach and "not as an estimation of the actual damages." *Id*. at 992.

Applying these precedents to the case at bar, we find that the provision before us indicates an intent to penalize the purchaser for a breach rather than an intent to compensate the seller in the event of breach. The earnest money deposit is clearly specified as partial payment of the purchase price, suggesting that the earnest money was not paid in lieu of performance, but rather as compulsion for the purchaser to complete his purchase of the property following the auction. Although there is no mention of forfeiture as a penalty, the provision is also not labeled as liquidated damages. Further, the Purchase Agreement provides that the remedy of specific performance may be available to the seller in the event of default, suggesting that there is no ability for the purchaser to simply 'walk away' in the event of his breach. These features arguably

15

favor interpretation of the provision as a penalty rather than as one providing for liquidated damages.

Support for this interpretation also emerges from the facts and circumstances of the transaction itself. *Mandle*, *Beck*, and *Rogers* all involved residential real estate purchases between individuals. The case at bar involves an auction of commercial real estate to the highest bidder. The Foundation auctioned the property in the face of unsustainable maintenance costs and failed attempts to sell the property. Kruse believed the property to be worth five million dollars based on its size. As the trial court found, "both parties to the [P]urchase [A]greement were sophisticated individuals with extensive experience in commercial real estate transactions for decades." (Appellant's App. p. 9). The contract used was a form agreement from the Indiana Association of Realtors and both Kruse and Gates had been board members of said association. Kruse testified that all bidders were informed of the required earnest money amount. Kruse also stated that the earnest money was used to pre-qualify bidders for participation in the auction. Kruse stood ready to perform his part of the bargain and, even without a breach, would have been entitled to retain the earnest money, applying to part of the purchase price under the express terms of the Purchase Agreement. This suggests that the earnest money was not intended to be taken in lieu of purchase. Thus, the facts and circumstances point to an interpretation of the provision as compulsion for the purchaser to consummate the transaction, rather than a reasonable forecast of the damages to be paid in lieu of performance.

## B. *Additional Factors*

We consider two additional factors to determine whether a provision constitutes liquidated damages or a penalty. We consider the proportion of the amount claimed to be liquidated damages with the amount of the loss likely to occur in the event of breach. *Gershin*, 685 N.E.2d at 1128. We also consider whether the damages were certain or ascertainable in the event of breach. *See Rogers*, 767 N.E.2d at 992-93.

First, a party seeking to enforce a liquidated damages provision must demonstrate some proportionality between the loss and the sum established as liquidated damages. *Harbours Condominium Ass'n , Inc. v. Hudson*, 852 N.E.2d 985, 993 (Ind. Ct. App. 2006). If the sum is not greatly disproportionate to the loss likely to occur or the loss sought to be avoided, the provision will be accepted as a liquidated damages clause and not as a penalty. *Gershin*, 685 N.E.2d at 1128. However, if the sum sought to be fixed is grossly disproportionate to the loss which may result from the breach, courts will treat the sum as a penalty rather than as liquidated damages. *Id.*

Here, the trial court found that the earnest money of $100,000 represented 2.5% of the purchase price. Citing *Mandle*, the trial court concluded that 2.5% of the purchase price in this case was not grossly excessive or unjust because the purchase agreement in *Mandle* specified an earnest money deposit of 1% of the purchase price. However, Kruse testified that the amount of the earnest money deposit was known to bidders beforehand in order to pre-qualify them for participation at the auction. Presumably, neither the parties nor the other bidders would know what proportion the earnest money would bear

17

to the winning bid. We therefore do not find the proportion of the forfeited amount to the sales price to be dispositive.

Next, we turn to trial court's determination that damages in the event of breach were uncertain, except as determined by the sales price later received by the Kruse Parties. The trial court concluded that evidence of the property's value was uncertain because of the different market values for the property provided by Wessel. Wessel testified to Colliers' appraisal of the property based on multiple uses, with value ranges listed for each type of potential buyer – up to $5.2 million for an investor using the property for income purposes and $2 million for speculators. Upon Gates' breach, Colliers noted that the property was thereafter tainted: potential buyers would learn of Gates' refusal to purchase and being inquisitive as to why Gates refused to consummate the transaction, would therefore be reluctant to purchase the property, resulting in lower offers.

Wessel was equivocal on the approximate percentage of potential buyers per category and insisted on the original asking price of $5.6 million because he was without instructions to offer less following Gates' breach. However, Wessel testified that he believed the fair market value of the property at the time of the breach to be $3.5 million, which represented the Kruse Parties' counter-offer to the eventual buyer of the property following its sale in October 2008. Finally, Wessel offered his opinion that the Kruse Parties may have been able to receive more for the property if they had more time to market the property. Based on this testimony, the trial court concluded "[t]he uncertainty

18

regarding the value of the property and what it could be sold for within a certain time frame supports a conclusion that the ease of determining actual damages in this case is not what it may seem on the surface." (Appellant's App. p. 11).

We cannot agree with the trial court that evidence of the property's value was uncertain. "[I]n most real estate purchase agreements, a measure of damages should be readily ascertainable." *Rogers*, 767 N.E.2d at 990, fn. 6. The measure of damages in a breach of real estate contract is the difference between the sale price of the property to be sold and the fair market value of the property at the time of breach. *Showalter, Inc. v. Smith*, 629 N.E.2d 272, 275 (Ind. Ct. App. 1994), *abrogated on other grounds by Mitchell v. Mitchell*, 695 N.E.2d 920 (Ind. 1998). The price paid by a subsequent purchaser following the breach may also be admissible as evidence of the property's fair market value. *See id*.

Here, there was sufficient evidence for the trial court to determine the fair market value of the property at the time of breach. Wessel testified to his opinion of fair market value at the time of breach, $3.5 million. Approximately two months following the breach, by October 2008, the Kruse Parties sold the property for $2.35 million. This evidence was uncontested at the hearing. Further, we note that the lapse of time between the breach and the date of the subsequent sale does not necessarily render the foregoing amounts "unsuitable for determining the fair market value of the property at the time of the breach." *Showalter*, 629 N.E.2d at 275. Accordingly, because the Kruse Parties provided sufficient evidence to allow the trial court to determine the fair market value of

19

the property following Gates' breach, we find that the trial court erred by concluding that damages were uncertain. *Cf. Patel v. United Inns, Inc.*, 887 N.E.2d 139, 150-51 (Ind. Ct. App. 2008), *reh'g denied*.

## C. *Exclusivity of Remedies*

Finally, we examine the trial court's conclusion that the Kruse Parties were precluded from exercising any remedy except specific performance upon Gates' breach. The Purchase Agreement provided that upon forfeiture of the earnest money deposit, "the seller may sue for specific performance." (Appellant's App. p. 27). The trial court found this language to be unambiguous and limited the Kruse Parties to retention of the earnest money and specific performance. Further, the trial court relied upon an integration clause in the Purchase Agreement to determine that the Kruse Parties could only avail themselves of specific performance and the forfeited deposit as remedies following breach. Because the Kruse Parties elected to sell the property, the trial court concluded that they waived the availability of specific performance and their damages were limited to the earnest money deposit. The integration clause provided that the Purchase Agreement contained all "the terms and conditions agreed upon, it being agreed that there are no conditions, representations, warranties or agreements not stated in this instrument." (Appellant's App. p. 27).

Here, the Kruse parties contend that the provision at issue is permissive in scope and thus its damages are not limited solely to specific performance and the forfeited deposit. The Kruse parties argue that the language of the Purchase Agreement does not

20

contain the word 'exclusive' and that there is no other express or implied limitation on their contractual remedies. They also contend that the integration clause does not exclude their remedies at law because an exclusion of remedies must be stated definitely and affirmatively in the contract to show clear intent to exclude a remedy.

In contrast, Gates relies upon his argument that the forfeited earnest money constitutes liquidated damages as well as the integration clause to argue that the Purchase Agreement "did not provide for any other remedies, and specified it contained all the terms and conditions agreed upon by the parties." (Appellee's Br. p. 12). As such, Gates contends that the Kruse Parties are without a remedy, except as specified in the Purchase Agreement.

We cannot agree with the trial court that the Kruse Parties are precluded from asserting legal damages. Generally, a party is entitled to damages at law unless specifically excluded in the agreement. *See Four Seasons Mfg., Inc. v. 1001 Coliseum*, LLC, 870 N.E.2d 494, 502 (Ind. Ct. App. 2007). While it is true the Purchase Agreement makes no mention of remedies other than specific performance, the clear import is that the Kruse Parties were entitled to such remedies as the law may allow and may elect from among them the remedy of specific performance. The remedy of specific performance is preceded by the word "may," which connotes permission rather than a requirement. Moreover, providing a party with a remedy does not necessarily make it exclusive. Thus, the language indicates that the Kruse Parties had a choice between either remedies – it could pursue specific performance, an equitable remedy, but was not required to do so.

21

*See Rogers*, 767 N.E.2d at 992. As such, we find that the provision does not provide a definite and affirmative limitation. Thus, the Kruse Parties' remedies were not limited solely to the forfeited earnest money deposit and specific performance.

The integration provision in the Purchase Agreement does not alter this conclusion. Generally, where the parties to an agreement have reduced the agreement to a written document and have stated in an integration clause that the written document embodies the complete agreement between the parties, the parol evidence rule prohibits courts from considering parol or extrinsic evidence for the purpose of varying or adding to the terms of the written contract. *I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1035 (Ind. Ct. App. 1998), *trans. denied*. The underlying assumption advanced by the trial court and by Gates is that legal remedies contradict the terms of the Purchase Agreement. As discussed above, they do not. Accordingly, we conclude that the Kruse Parties' remedies were not limited by the Purchase Agreement to the forfeited earnest money and specific performance, but instead also include the full measure of damages for breach of contract.

In sum, we hold the contractual provision to be an unenforceable penalty based on the following factors. First, the language of the Purchase Agreement, the facts and circumstances of the transaction demonstrate that the parties intended the provision at issue to act as a penalty, rather than an agreed measure of damages. Second, evidence of damages presented to the trial court was reasonably certain, therefore precluding a finding of liquidated damages. Finally, the Purchase Agreement does not preclude the

Kruse Parties from seeking damages for Gates' breach. Thus, we conclude that the provision at issue cannot be enforced as a liquidated damages provision and instead represents an unenforceable penalty.

Because the trial court concluded that the provision at issue constituted a liquidated damages provision, it necessarily did not determine the amount of contractual damages awardable to the Kruse Parties. Having determined the earnest money forfeiture provision to be a penalty, we remand to the trial court for a proper determination of damages consistent with this opinion.

## CONCLUSION

Based on the foregoing, we conclude that the trial court erred in determining that the forfeiture provision in the Purchase Agreement constituted a liquidated damages clause. We reverse the judgment of the trial court and remand with instructions to the trial court to calculate the measure of damages as a result of Gates' breach of contract.

Reversed and remanded with instructions.

DARDEN, S.J. and MAY, J. concur